UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CONSERVATION LAW FOUNDATION, INC., )
ET AL.,                             )
        Plaintiffs,                 )
                                    )
        v.                          )   C.A. No. 10-11455-MLW
                                    )
UNITED STATES ENVIRONMENTAL         )
PROTECTION AGENCY, Lisa P.          )
Jackson, Administrator, ET AL.,     )
        Defendants.                 )

MEMORANDUM AND ORDER

WOLF, D.J.                                    August 29, 2013

I. INTRODUCTION

Plaintiffs Conservation Law Foundation ("CLF") and Buzzards Bay Coalition, Inc. ("BBC") bring this case against the United States Environmental Protection Agency ("EPA"), by suing its Administrator, Lisa P. Jackson, and its Regional Administrator, Curt Spalding, in their official capacities. Plaintiffs assert three claims under the Clean Water Act (the "CWA"), 33 U.S.C. §§1313(d)(1)(C) and 1362(14), and the Administrative Procedure Act (the "APA"), 5 U.S.C. §706(2).

In general, plaintiffs challenge the EPA's approval of thirteen Total Maximum Daily Loads (the "TMDLs"), which are documents that set forth how much pollution a body of water can receive without negatively affecting its designated uses. A TMDL has been characterized as a "pollution budget." The TMDLs were initially prepared by the Massachusetts Department of Environmental Protection (the "MassDEP") and then submitted to the EPA for

approval. Plaintiffs claim that the EPA committed various errors in approving the TMDLs, which caused the waters covered by the TMDLs (the "waters" or "embayments") to become increasingly polluted by nitrogen. Plaintiffs allege that the nitrogen pollution negatively affects their recreational, aesthetic, and commercial interests in the waters.

More specifically, plaintiffs allege in Count I that the EPA's approval of the TMDLs was arbitrary and capricious because the TMDLs failed to classify septic systems, certain storm water systems, and waste water treatment facilities (the "Sources") as "point sources," and failed to assign the Sources to the Wasteload Allocation (the "WLA") category in the TMDLs (the "Misclassification Claim"). See Compl. ¶¶61-64, 68-71, 74-76, 89. Instead, the TMDLs classified the Sources as "non-point sources," and assigned them to the Load Allocation (the "LA") category in the TMDLs. See id. ¶¶59-62, 65-69, 72-73, 89. A point source is generally defined as any discernable and discrete conveyance of pollutants. See 33 U.S.C. §1362(14). In contrast, "[a] 'nonpoint source' is any source of water pollution or pollutants not associated with a discrete conveyance." Or. Nat. Res. Council v. Lyng, 882 F. 2d 1417, 1424 n.8 (9th Cir. 1989), amended by 899 F.2d 1565 (9th Cir. 1990). By approving the classification of the Sources as non-point sources that were assigned to the LA, the EPA allowed the Sources to be subject only to discretionary state

regulation, rather than the mandatory federal pollution permitting system, called the National Pollution Discharge Elimination System (the "NPDES"), which governs point sources. <u>See</u> Compl. ¶¶24-27.

Plaintiffs allege in Counts II and III that the EPA ignored the effects of climate change on the embayments when approving the TMDLs (the "Climate Change Claim"). To support the Climate Change Claim, plaintiffs allege that the EPA's approval of the TMDLs was unreasonable because the "margin of safety" portion of the TMDLs did not account for the impacts of climate change on the embayments. <u>See</u> <u>id.</u> ¶¶77-84, 91, 93. The margin of safety portion of the TMDLs takes into account any lack of knowledge concerning the relationship between the quality of a certain body of water and the controls that have been placed on the discharge of pollutants into that water. <u>See</u> <u>id.</u> ¶22.

In the Complaint, plaintiffs seek declaratory and injunctive relief that would vacate the EPA's approval of the relevant TMDLs and order the EPA to allocate the Sources to the WLA with an adequate margin of safety.

The parties filed cross-motions for summary judgment. Hearings on the motion were held on August 20, 2013 and August 21, 2013. For the reasons stated below, the court is allowing defendants' motion for summary judgment because plaintiffs have failed to provide sufficient admissible evidence to permit a reasonable factfinder to conclude that plaintiffs or their members have the constitutionally

required standing to litigate the claims in this case.

II. THE CWA'S STATUTORY AND REGULATORY REGIME

The objective of the CWA "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. §1251(a). Subject to certain exceptions, the CWA renders unlawful "the discharge of any pollutant by any person." Id. §1311(a). "The term 'discharge of a pollutant' and the term 'discharge of pollutants' each means (A) any addition of any pollutant to navigable waters from any point source, (B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft." Id. §1362(12). A "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, [or] container, . . . from which pollutants are or may be discharged." Id. §1362(14).

To implement the CWA and achieve its objectives, the statute "establishes distinct roles for the Federal and State Governments." PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology, 511 U.S. 700, 704 (1994); see also Upper Blackstone Water Pollution Abatement Dist. v. EPA, 690 F.3d 9, 14 (1st Cir. 2012), cert. denied, --- U.S. ---, 133 S. Ct. 2382 (2013). The CWA's regulations require each state to adopt water quality standards, which function "to protect the public health or welfare, enhance the quality of

water and serve the purposes of the [CWA]." 40 C.F.R. §131.3(i). Water quality standards "consist of a designated use or uses for the waters of the United States and water quality criteria for such waters based upon such uses." Id. §131.3(i); see also 33 U.S.C. §§1313(a) and (c)(1). "When criteria are met, water quality will generally protect the designated use." 40 C.F.R. §131.3(b).

Each state also must identify waters within its boundaries where the restrictions on discharges from point sources "are not stringent enough to implement any water quality standard applicable to such waters." 33 U.S.C. §1313(d)(1)(A); see also Upper Blackstone, 690 F.3d at 14 ("The CWA also requires states to identify the waters within their boundaries that fail to meet their designated water quality standards . . . ."). Those bodies of water are called a "water quality limited segment." 40 C.F.R. §130.2(j); see also Sierra Club v. Meiburg, 296 F.3d 1021, 1025 (11th Cir. 2002). Where limitations on point source discharges are insufficient to achieve the requisite water quality standards, each state is required to establish a TMDL for each relevant pollutant. See 33 U.S.C. §1313(d)(1)(C); see also Upper Blackstone, 690 F.3d at 14 n.8.

"A TMDL is, in essence, a pollution budget, and it represents a calculation of the maximum amount of a pollutant that a water body can receive and still meet water quality standards." Am. Farm Bureau Fed'n v. U.S. Envtl. Protection Agency, 278 F.R.D. 98, 101

(M.D. Pa. 2011). The theory of a TMDL "is that individual-discharge permits will be adjusted and other measures taken so that the sum of [a] pollutant in the waterbody is reduced to the level specified by the TMDL." Meiburg, 296 F.3d at 1025.

Under the EPA's regulations, TMDLs are calculated as "[t]he sum of the individual WLAs for point sources and LAs for nonpoint sources and natural background." 40 C.F.R. §130.2(i). The WLA is "[t]he portion of a receiving water's loading capacity that is allocated to one of its existing or future point sources of pollution. WLAs constitute a type of water quality-based effluent limitation." Id. §130.2(h).[1] As noted earlier, a "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, [or] container, . . . from which pollutants are or may be discharged." 33 U.S.C. §1362(14).

The LA is "[t]he portion of a receiving water's loading capacity that is attributed either to one of its existing or future nonpoint sources of pollution or to natural background sources." 40 C.F.R. §130.2(g). "Unlike point source discharges, non-point source

---

[1] "Loading capacity" is defined the "greatest amount of loading that a water can receive without violating water quality standards." 40 C.F.R. §130.2(f). "The term 'effluent limitation' means any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance." 33 U.S.C. §1362(11).

discharges . . . are not defined by the CWA." <u>Defenders of Wildlife</u> <u>v. U.S. Envtl. Protection Agency</u>, 415 F.3d 1121, 1124 (10th Cir. 2005). "Non-point source pollution has been described as nothing more [than] a [water] pollution problem not involving a discharge from a point source." <u>Id.</u> (internal quotation marks omitted).

As indicated earlier, a state's designation of certain sources of pollution as "point sources" rather than as "non-point sources" affects the regulatory scheme to which those sources of pollution are subject. Pollutants that are discharged from a "'point source' into the navigable waters must obtain a[] [federal National Pollution Discharge Elimination System or] NPDES permit." <u>Upper</u> <u>Blackstone</u>, 690 F.3d at 14 (citing 33 U.S.C. §§1311(a) and 1342). "An NPDES permit serves to transform generally applicable effluent limitations and other standards including those based on water quality into the obligations (including a timetable for compliance) of the individual discharger, and the [CWA] Amendments provide for direct administrative and judicial enforcement of permits." <u>Envtl.</u> <u>Protection Agency v. Cal. ex rel. State Water Res. Control Bd.</u>, 426 U.S. 200, 205 (1976), <u>superseded by statute</u>, Clean Water Act of 1977, Pub. L. No. 95-217, 91 Stat. 1597, <u>as recognized in</u> <u>United</u> <u>States v. Penn. Envtl. Hearing Bd.</u>, 584 F.2d 1273, 1280 n.22 (3rd Cir. 1978). Stated differently, "NPDES permits bring both state ambient water quality standards and technology-based effluent limitations to bear on individual discharges of pollution, [33

U.S.C.] §1342(a)(3), (b)(1)(A), and tailor these to the discharger through procedures laid out in the [CWA] and in EPA regulations, id. §1342." Upper Blackstone, 690 F.3d at 14. While some states are authorized to administer NPDES permits, in Massachusetts the EPA directly administers them. See id.

In contrast to the federal regulatory scheme governing point sources, "all nonpoint sources are excluded from the effluent limitations and the NPDES program . . . [and] are not subject to the stringent control scheme established for point sources." Natural Res. Def. Council, Inc. v. Train, 396 F. Supp. 1393, 1395 (D.D.C. 1975), aff'd, 568 F.2d 1369 (D.C. Cir. 1977). "Unlike point source pollutants, the EPA lacks the authority to control non-point source discharges through a permitting process." Defenders of Wildlife, 415 F.3d at 1124. In addition, "the CWA does not require states to take regulatory action to limit the amount of non-point water pollution introduced into its waterways[;] . . . nothing in the CWA demands that a state adopt a regulatory system for nonpoint sources." Id.

A state's TMDL must also include what is termed a "margin of safety." 33 U.S.C. §1313(d)(1)(C); see also Upper Blackstone, 690 F.3d at 14 n.8. A TMDL's margin of safety "takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." 33 U.S.C. §1313(d)(1)(C).

Once a state has developed a TMDL, it is subject to public

comment, as defined by the state's own processes. See 40 C.F.R. §130.7(c)(1)(ii). After that comment period, a state finalizes and submits the TMDL to the EPA. See 33 U.S.C. §1313(d)(2); 40 C.F.R. §130.7(d)(1). The EPA has thirty days from the date of submission of a state's TMDL to approve or disapprove it. See 33 U.S.C. §1313(d)(2); 40 C.F.R. §130.7(d)(2). The "EPA's primary concern in determining whether to approve the TMDL is whether or not the TMDL will 'implement the applicable water quality standard.'" Natural Res. Def. Council, Inc. v. Muszynski, 268 F.3d 91, 100 (2d Cir. 2001) (quoting 33 U.S.C. §1313(d)(1)(C)).

III. LEGAL STANDARDS

The parties have filed cross-motions for summary judgment on plaintiffs' claims. Among other things, defendants argue that plaintiffs have introduced insufficient admissible evidence for a reasonable factfinder to conclude that plaintiffs have the constitutionally required standing to litigate their claims.

There are three constitutional requirements for plaintiffs to have standing. "First, [] plaintiff[s] must have suffered an 'injury in fact' – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (internal citations, quotation marks, and footnote omitted); see also Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir. 2012). "Second, there must be a causal

connection between the injury and the conduct complained of – the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Lujan, 504 U.S. at 560 (internal quotation marks omitted); see also Katz, 672 F.3d at 71-72. "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan, 504 U.S. at 561 (internal quotation marks omitted); see also Katz, 672 F.3d at 72.

Because plaintiffs are the party seeking to invoke federal jurisdiction, they bear the burden of establishing the elements of standing for each claim that they assert. See Lujan, 504 U.S. at 561; Katz, 672 F.3d at 71. Plaintiffs must establish each of the elements of standing "in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Lujan, 504 U.S. at 561. Where, as here, the court is addressing the issue of standing on cross-motions for summary judgment, plaintiffs "must 'set forth' by affidavit or other evidence 'specific facts,'" id. (quoting Fed. R. Civ. P. 56(e)), that show that a genuine dispute of material fact exists concerning standing, see Lujan, 504 U.S. at 590 (Blackmun, J., dissenting) (citing Fed. R. Civ. P. 56); Munoz-Mendoza v. Pierce, 711 F.2d 421, 425 (1st Cir. 1983).

Rule 56(a) of the Federal Rules of Civil Procedure provides, in pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). To determine if the dispute about a material fact is "genuine," the court must decide whether "the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." Id.; see also Oliver v. Digital Equip. Corp., 846 F.2d 103, 105 (1st Cir. 1988).

The evidence relied upon in determining whether or not there exists a genuine dispute of material fact must be admissible. See Hannon v. Beard, 645 F.3d 45, 49 (1st Cir. 2011) ("A genuine issue of material fact can be created only by materials of evidentiary quality."); Vazquez v. Lopez-Rosario, 134 F.3d 28, 36 (1st Cir. 1998). Accordingly, "[t]o establish constitutional standing at the summary judgment stage, 'a plaintiff cannot rest on mere allegations.'" ComCox, Inc. v. Chaffee, 536 F.3d 101, 106 (1st Cir. 2008) (quoting Libertad v. Welch, 53 F.3d 428, 436 (1st Cir. 1995)); see also Lujan, 504 U.S. at 561 ("[i]n response to a summary judgment motion, however, the plaintiff can no longer rest

11

on [] mere allegations" (internal quotation marks omitted)). In addition, the evidence must be viewed in the light most favorable to the non-moving party. See Montalvo v. Gonzalez-Amparo, 587 F.3d 43, 46 (1st Cir. 2009).

An organization, such as each of the plaintiffs here, may sue based on an injury to itself, see Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 n.19 (1982), or, under certain circumstances, it may "sue based on injuries to its members' interests," Animal Welfare Inst. v. Martin, 623 F.3d 19, 25 (1st Cir. 2010); see also Council of Ins. Agents & Brokers v. Juarbe-Jimenez, 443 F.3d 103, 108 (1st Cir. 2006). An organization has standing to bring an action "based on injuries to its members' interests only if (1) at least one of its members would have standing to sue as an individual, (2) 'the interests at stake are germane to the organization's purpose,' and (3) individual members' participation is not necessary to either the claim asserted or the relief requested." Animal Welfare Inst., 623 F.3d at 25 (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181 (2000)).

IV. FACTS

The following facts are taken from the administrative record in this case.

The MassDEP developed the thirteen TMDLs relating to the embayments now at issue, which are located in the areas of Cape Cod

and Nantucket. See Pls.' Exs. 1-13. Those TMDLs generally include: (1) a description of the water quality issues in the embayments; (2) analysis of the role that nitrogen plays in degrading water quality; (3) an overview of the model that was used to gather the pertinent data; (4) a designation of certain sources as point sources and other sources as non-point sources; (5) an assignment of certain sources to the WLA and other sources to the LA; (6) discussion of the margin of safety calculation; (7) an implementation plan; (8) a monitoring plan; and (9) discussion of public participation in the process of establishing the TMDLs. See, e.g., Pls.' Ex. 7, EPA_12251-85.[2] The TMDLs state that the "continued degradation" of the embayments "will significantly reduce the recreational and commercial value and use of these important environmental resources." Id. at EPA_12261. The thirteen TMDLs were submitted to the EPA and approved. See Pls.' Exs. 14-26.

The TMDLs are based primarily on data gathered and analyzed by the Massachusetts Estuaries Project (the "MEP"). See, e.g., Pls.' Ex. 7, EPA_12257. The MEP's report concerning the Phinneys Harbor embayment acknowledges "the significant time and effort in data

---

[2] Because the TMDLS generally contain similar information, this Memorandum and Order refers to the Centerville TMDL as an example. See Pls.' Ex. 7. In this Memorandum and Order, the citations to EPA_#####, refer to documents in the administrative record. The parties do not dispute the contents of the administrative record. See Defs.' Statement of Material Facts Not Genuinely in Dispute at 1; Pls.' Obj. to Defs.' Second "Statement of Facts Genuinely in Issue" at 3.

collection and discussion spent by members and volunteers of the Coalition for Buzzards Bay BayWatchers Water Quality Monitoring Program, particularly Tony Williams, its Coordinator." Pls.' Ex. 58, EPA_09400.[3] "The BayWatchers is a citizen-based water quality management program run by the Coalition for Buzzards Bay." Id. at EPA_09414. The focus of the BBC's BayWatchers Program is to "gather data on the current nitrogen related water quality throughout all the embayments tributary to Buzzards Bay and determine the relationship between observed water quality and habitat health." Id. at EPA_09414. The MEP report states that members and volunteers in the BayWatchers Program collected water quality data regarding the embayments tributary to Buzzards Bay for many years, which contributed to the MEP's analysis and the ecological management of the embayments. See id. at EPA_09400, 09414.

The MEP's report concerning West Falmouth Harbor states that the BayWatchers Program helps "monitor[] West Falmouth Harbor nutrient related water quality." Pls.' Ex. 63, EPA_11380. The BBC's program "continues to play an active role in the collection of baseline water quality data to this day." Id.

CLF vice president and program director, Christopher M. Kilian, Esq., submitted a public comment to the MassDEP concerning

---

[3] The BBC was formerly named "The Coalition for Buzzards Bay." See Jan. 4, 2012 Order.

the Centerville TMDL. See Pls.' Ex. 51, EPA_12290-91.[4] In his comment, Mr. Kilian stated that the TMDL for that embayment erroneously classifies the Sources as non-point sources and wrongly assigns them to the LA. See id. He also described the negative impacts of nitrogen pollution on commercial and recreational uses of the Centerville embayment. See id.

The following facts are not taken from the administrative record. With respect to climate change, the EPA has published a report entitled: "National Water Program Strategy Response to Climate Change." Pls.' Ex. 50. That report states, in part, that increased air temperatures will result in higher water temperatures, which "foster harmful algal blooms and change the toxicity of some pollutants." Id. at ii. The publication further states that the TMDL program is one of numerous water quality programs that will be affected by climate change, in part because as water temperatures rise more bodies of water will not meet water quality standards and will, therefore, require the development of a TMDL. See id. at 9. "[D]ischarge permits and nonpoint pollution control programs may need to be adjusted to reflect changing conditions." Id.

The parties agreed to a schedule for filing the cross-motions for summary judgment, responses, and related memoranda and

---

[4] Mr. Kilian is one of the attorneys representing CLF in this case.

affidavits. A long line of Supreme Court and other precedents emphasized the need for plaintiffs to support or respond to a motion for summary judgment by introducing admissible evidence sufficient to permit a reasonable factfinder to conclude that they, or their members, have standing to litigate their claims. See, e.g., Lujan, 504 U.S. at 561; Friends of the Earth, 528 U.S. at 183-84; Citizens to End Animal Suffering and Exploitation v. The New England Aquarium, 836 F. Supp. 45, 48 (D. Mass. 1993) (Wolf, J.). Plaintiffs did not, however, file affidavits seeking to establish standing with their motion for summary judgment. In the memorandum in support of defendants' motion for summary judgment, filed on the same day as plaintiffs' motion, defendants argued that plaintiffs had not submitted the evidence required to satisfy their burden to establish standing at the summary judgment stage. Plaintiffs did not, however, file any affidavits concerning standing with their opposition to defendants' motion for summary judgment.

On August 15, 2013, the court issued an Order identifying this issue and ordered the parties to be prepared to address it at the August 20, 2013 hearing. In that Order, the court stated that: "The cross-motions have long been fully briefed and the parties agreed no replies would be filed. See Docket No. 26, ¶5. Therefore, the court does not intend to permit further submissions concerning the pending motions." Aug. 15, 2013 Order, at 1 n.1.

Nevertheless, at the August 20, 2013 hearing, plaintiffs proffered two affidavits, one from Sara Molyneaux and the other from John D. Ross. Plaintiffs' counsel stated that those two affidavits had been obtained in 2010, but plaintiffs' counsel made the decision not to file them. The Molyneaux affidavit is date stamped August 13, 2010 on the first page, but the portion of the affidavit reserved for the declarant to write the date is blank. The Ross affidavit was executed on August 19, 2013, the day before the hearing on the cross-motions for summary judgment. At the August 20, 2013 hearing, the affidavits were not accepted as evidence. However the Molyneaux affidavit was marked for identification as Exhibit A and the Ross affidavit was marked as Exhibit B.

It would be well within the court's discretion to deny plaintiffs' belated request to have the Molyneaux and Ross affidavits made part of the evidentiary record. Lujan and its progeny put plaintiffs on notice of their need to provide admissible evidence that they, or their members, have standing to litigate their claims. Plaintiffs' counsel evidently recognized this requirement and included allegations concerning standing in the complaint. See Compl. ¶10. Defendants' motion for summary judgment and supporting memorandum put plaintiffs on notice that their standing was disputed, yet plaintiffs did not respond by filing the required affidavits. The court prepared to hear and

decide orally the motions for summary judgment on a record the parties agreed was complete. Permitting belated supplementation of the evidentiary record requires the court to expend additional time and effort to reanalyze the issues, at the expense of other matters on the court's docket.

However, the court recognizes that this case is important to the parties. In addition, the court prefers to decide matters on their merits and not allow parties to suffer from the errors of their counsel. Therefore, the court has, on reflection, decided to admit the Molyneaux and Ross affidavits as Exhibits 70 and 71 respectively.

In her affidavit, Molyneaux states the following. Molyneaux is a member of CLF. See Molyneaux Decl. ¶2. She has been a summer resident of Cape Cod and has owned property in Cotuit, Massachusetts for many years. See id. ¶1. Molyneaux has used and enjoyed the embayments as a sailor, fisherman, and swimmer. See id. ¶¶3, 7. She has also used the land around the embayments for walking, bicycling, bird watching, and enjoying nature. See id. ¶3. Molyneaux's "ability to use and enjoy these waterways and coastal wetlands is harmed by nitrogen pollution." Id. ¶4; see also id. ¶10. More specifically, her ability to swim and sail in certain waters has been limited by the excessive plant and algae growth that results from nitrogen pollution. See id. ¶¶3-7. Molyneaux would like to sail, swim, and fish in certain waters, but her

interest in doing so is negatively affected by the nitrogen pollution. See id. ¶¶7-8. She is also concerned that the value of the property that she owns "will be substantially reduced" if the embayments continue to be degraded by pollution. Id. ¶13.

Molyneaux also states that "[i]t is my understanding that discharges from septic systems, polluted stormwater runoff from roadways and other paved areas, and wastewater treatment plants are a main cause of" the excessive plant and algae growth caused by nitrogen pollution. Id. ¶12. She "believe[s] that if EPA and the Cape Cod Commission were taking a more active role in regulating the nitrogen pollution from these sources, the waterways would not be in their current degraded condition." Id.

Ross asserts the following in his affidavit. Ross is a member of BBC and has been a summer resident of Cape Cod since 1938. See Ross Decl. ¶¶2-3. He has sailed for decades and plans to continue to sail in the waters of Cape Cod for as long as he is able. See id. ¶¶4, 9. His ability to "use and enjoy these waterways and coastal wetlands has been adversely affected by nitrogen pollution." Id. ¶6; see also id. ¶9. He no longer swims in a certain area because of nitrogen pollution. See id. ¶6. Ross is also no longer able to enjoy native scallops from certain waters because of his understanding about the effects of nitrogen pollution. See id. ¶¶6-7. His ability to populate a salt water aquarium for his grandchildren is now negatively affected by the

nitrogen pollution in the water. See id. ¶10. Ross is concerned that the value of the property that he owns will be reduced if the water quality continues to degrade. See id. ¶11.

Ross "understand[s] that nitrogen discharges from septic systems, polluted stormwater runoff from roadways and other paved areas, and the wastewater treatment plans are the main causes of" the increased plant and algae growth that results from nitrogen pollution. Id. ¶12. He "believe[s] that if EPA takes a more active role in regulating the nitrogen pollution from these sources, as required by the Clean Water Act, the water quality in Cape Cod would improve, and [his] ability to enjoy the waterways that [he] grew up with and continue[s] to regularly use would increase." Id. Ross also "believe[s] that the EPA regulation of point sources on Cape Cod, such as septic systems, wastewater treatment facilities, and stormwater, will assure that effective measures will be taken to reduce nitrogen pollution." Id. ¶13. Ross claims that he is "harmed by EPA's failure to permit these sources." Id.

V. DISCUSSION

As explained earlier, to defeat a motion for summary judgment, plaintiffs cannot rest on mere allegations, Lujan, 504 U.S. at 561; CoxCom, Inc., 536 F.3d at 106, or arguments in their memoranda of law, because those are not "materials of evidentiary quality," Hannon, 645 F.3d at 49. Rather, plaintiffs must "must 'set forth' by affidavit or other evidence 'specific facts,'" Lujan, 504 U.S.

at 561 (quoting Fed. R. Civ. P. 56(e)), that show that a genuine dispute of material fact exists concerning standing, see Lujan, 504 U.S. at 590 (Blackmun, J., dissenting); Munoz-Mendoza, 711 F.2d at 425. "The standing inquiry is claim-specific: a plaintiff must have standing to bring each and every claim that she asserts." Katz, 672 F.3d at 71.

Accepting for present purposes as true the information in the Molyneaux and Ross affidavits, and viewing all of the admissible evidence in the light most favorable to plaintiffs, the court concludes that a reasonable factfinder could not find that plaintiffs or their members satisfy each of the three constitutional requirements for standing to litigate the claims in this case. With respect to plaintiffs' Misclassification Claim, the Molyneaux and Ross affidavits are adequate to establish a genuine dispute concerning the injury in fact element of standing, but not the redressibility element. Nor would the other evidence in the record that directly concerns plaintiffs, the MEP reports and Mr. Kilian's public comment, allow a reasonable factfinder to conclude that the injury to Molyneaux and Ross would likely be redressed by a favorable decision in this case.

With regard to the Climate Change Claim, the Molyneaux and Ross affidavits and the other evidence in the record concerning climate change to which plaintiffs have pointed are insufficient to allow a reasonable factfinder to conclude that plaintiffs have

suffered an injury in fact or that any such injury would likely be redressed if the court were to grant plaintiffs the relief that they seek concerning climate change.

Therefore, the court lacks jurisdiction over each of plaintiffs' claims because they have not provided evidence sufficient to prove the existence of a case or controversy under Article III of the Constitution. See Lujan, 504 U.S. at 560.

A. Injury In Fact

As described earlier, an injury in fact is the "invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (internal citations, quotation marks, and footnote omitted); see also Katz, 672 F.3d at 71. The Supreme Court has held that environmental plaintiffs can establish an injury in fact when they prove "that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." Friends of the Earth, 528 U.S. at 183 (quoting Sierra Club v. Morton, 405 U.S. 727, 735 (1972)). This formulation of injury in fact has two components. First, plaintiffs must provide evidence that they "use the affected area," Friends of the Earth, 528 U.S. at 183, which is to say that they have to establish "a cognizable interest for purpose of standing" in the environment that is allegedly being harmed, Lujan, 504 U.S. at 562-63. Second,

22

plaintiffs must submit evidence that the value of their interest "'will be lessened' by the challenged activity." <u>Friends of the Earth</u>, 528 U.S. at 183 (quoting <u>Sierra Club</u>, 405 U.S. at 735).

In <u>Friends of the Earth</u>, the Supreme Court discussed the type of evidence that is sufficient to establish a plaintiff's injury in fact at the summary judgment stage. <u>See</u> 528 U.S. at 177, 181-84. In that case, the Court held that the organizational plaintiffs had provided adequate evidence of standing because their members had submitted affidavits and deposition testimony describing their "reasonable concerns" that the defendant's discharges of pollutants "directly affected those affiants' recreational, aesthetic, and economic interests." <u>Id.</u> at 183-84. Specifically, members of the organizational plaintiffs in <u>Friends of the Earth</u> provided affidavits and deposition testimony stating that: (1) they lived near the polluted waters; (2) they had used those waters in the past for recreational purposes but no longer wished to do so because of the defendant's pollution; and (3) the value and desirability of property that the members owned or were interested in purchasing near the waters had decreased, purportedly as a result of defendant's pollution. <u>See</u> <u>id.</u> at 182-83.

In this case, with respect to the Misclassification Claim, the Molyneaux and Ross affidavits are analogous to the members' sworn statements in <u>Friends of the Earth</u> and, therefore, are adequate to put injury in fact in genuine dispute. Molyneaux and Ross each

23

declare that they reside near the polluted waters, at least in the summer. See Molyneaux Decl. ¶1; Ross Decl. ¶2. They have used the embayments for sailing, fishing, and swimming, among other activities, and they no longer can use those waters with the same degree of enjoyment as in the past because of the effects of nitrogen pollution. See Molyneaux Decl. ¶¶3-7; Ross Decl. ¶¶4, 6-7, 9-10. They understand that a main cause of the pollution that limits their use and enjoyment of the embayments is the discharge from septic systems, polluted stormwater runoff, and wastewater treatment facilities, which are the Sources at issue in the Misclassification Claim. See Molyneaux Decl. ¶12; Ross Decl. ¶12. Finally, each of the declarants is concerned that the value of his or her property will be reduced if the pollution of the embayments continues. See Molyneaux Decl. ¶13; Ross Decl. ¶11.

In addition, Molyneaux and Ross's affidavits would allow a reasonable factfinder to conclude that, with respect to the Misclassification Claim, their injury is "actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (internal citations, quotation marks, and footnote omitted); see also Katz, 672 F.3d at 71. In Lujan, the Supreme Court discussed the requirement that an injury for standing purposes be actual or imminent. See 504 U.S. at 563-64. In that case, environmental organizations challenged a revised regulation promulgated under the Endangered Species Act. See id. at 559. The regulation had

originally provided protection for endangered species abroad, as well as in the United States. See id. at 558. It was revised to require certain consultations concerning actions affecting endangered species only if those actions were taken in the United States or on the high seas. See id. at 558-59. The organizations sought to establish their standing to challenge this limitation through affidavits and testimony from their members. See id. at 563. That evidence generally stated that the organizations' members had observed certain endangered animals or their habitats abroad, and hoped or intended "some day" to return abroad to again observe the threatened animals. Id. at 563-64. The Supreme Court held that the environmental organizations had not provided adequate evidence of the required injury to their members because "[s]uch 'some day' intentions – without any description of concrete plans, or indeed even any specification of when the some day will be – do not support a finding of the 'actual or imminent' injury that our cases require." Id. at 564.

In contrast to Lujan, Molyneaux and Ross state that they spend each summer near the waters of Cape Cod and currently use those waters for various recreational purposes, as they have done for many years. See Molyneaux Decl. ¶¶1, 3-4, 6; Ross Decl. ¶¶2, 4, 9-10. They each declare that their ability to use and enjoy the embayments is now being harmed by the nitrogen pollution. See Molyneaux Decl. ¶¶4, 6; Ross Decl. ¶¶6-7, 9-10. These facts

distinguish Molyneaux and Ross from the organizational plaintiffs' members in Lujan, who had no definite plans to return to see the threatened animals in that case. See 504 U.S. at 564. Accordingly, the Molyneaux and Ross affidavits would allow a reasonable factfinder to conclude that they have suffered an injury in fact.

With respect to the Climate Change Claim, the Molyneaux and Ross's affidavits do not place injury in fact in genuine dispute. The two affidavits are sufficient to permit a reasonable factfinder to conclude that Molyneaux and Ross have a cognizable interest in the waters of Cape Cod for purposes of standing because they use and enjoy those waters for sailing, swimming, fishing, and other purposes. See Friends of the Earth, 528 U.S. at 183 ("'the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing'" (quoting Lujan, 504 U.S. at 562-63)). However, to establish a genuine dispute concerning an injury in fact, plaintiffs must show that, "apart from their special interest in th[e]" embayments, that interest "would [] be directly affected" by the EPA's failure to consider climate change when approving the TMDLs. Lujan, 504 U.S. at 563 (internal quotation marks omitted); see also Friends of the Earth, 528 U.S. at 183-84 ("environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the

challenged activity") (internal quotation marks omitted) (emphasis added).

In Friends of the Earth, the Supreme Court concluded that the plaintiffs submitted sufficient evidence concerning injury in fact at the summary judgment stage, in part because the "the affidavits and testimony presented" by the plaintiffs contained specific information concerning how the defendant's discharges of pollution "directly affected those affiants' recreational, aesthetic, and economic interests." 528 U.S. at 183-84. Similarly, in Sierra Club v. Tennessee Valley Authority, the United States Court of Appeals for the Eleventh Circuit found that the organizational plaintiffs had provided adequate evidence of injury in fact at the summary judgment stage, in part because one of their members attested that he "refrains from boating and hunting in areas near the Colbert plant [operated by the defendant] because of its emissions." 430 F.3d 1337, 1345 (11th Cir. 2005). In that case, another member testified that "he engages in kayaking, fishing, and swimming on or in the Tennessee River near the Colbert plant, and that his enjoyment of those activities has been impaired by emissions from the plant." Id.; see also Sierra Club v. U.S. Army Corps of Eng'rs, 645 F.3d 978, 989 (8th Cir. 2011) (finding injury in fact where one of the plaintiffs' members "is disturbed by the 'enormous amount of mud' and siltation from the plant site . . . as well as noise and light pollution coming from the plant"); Ecological Rights Found.

v. Pac. Lumber Co., 230 F.3d 1141, 1150 (9th Cir. 2000) (finding standing where the plaintiffs' members "alleged that the [defendant's] conduct has impaired their enjoyment of [recreational] activities").

In contrast, the Supreme Court has concluded that an organizational plaintiff lacks standing where the affidavit on which it relies does not connect the alleged injury to the defendant's activity. In Summers v. Earth Island Institute, the plaintiffs challenged the Forest Service's failure to apply a regulation to the salvage lumber sale for timber that was burned in a particular forest. See 555 U.S. 488, 491 (2009). The affidavit on which the organizational plaintiffs relied in that case stated that an individual associated with the plaintiffs "had suffered injury in the past from development on Forest Service land." Id. at 495. The Supreme Court held that the affidavit was insufficient, in part because that injury "was not tied to application of the challenged regulations." Id.

Similarly, in Wilderness Society, Inc. v. Rey, the United States Court of Appeals for the Ninth Circuit concluded that the organizational plaintiffs failed to provide sufficient evidence of standing at the summary judgment stage because the member's affidavit on which they relied did not connect the injury to the defendant's allegedly harmful actions. See 622 F.3d 1251, 1257 (9th Cir. 2010). In that case, the court stated that, "[t]here is no

28

indication that the [project at issue] would affect the particular area of the Umpqua Forest that [the declarant] plans to use in the future, or that it would otherwise impact his personal recreational or aesthetic interests in the land." Id. "The lack of any linkage between the project and the claimed injury undermines the effort to establish standing." Id.

The Molyneaux and Ross affidavits in this case do not assert any connection between the declarants' injuries and the EPA's alleged failure to consider the effects of climate change when approving the TMDLs. In contrast to the evidence found sufficient in Friends of the Earth, there is no information in the Molyneaux and Ross affidavits concerning how their interests in the waters "will be lessened by" by the EPA's alleged failures with respect to climate change. 528 U.S. at 183 (internal quotation marks omitted).[5] This case, therefore, is similar to Summers and Wilderness Society, where the courts concluded that the plaintiffs did not present adequate evidence of a link between their injury and the defendants' actions.

The only other evidence concerning climate change which plaintiffs identified at the hearings on the cross-motions for

---

[5] As explained earlier, in their affidavits, Molyneaux and Ross state that pollutants from the Sources misclassified as non-point sources are the "main cause" of the nitrogen pollution that is injuring their enjoyment of the embayments. Molyneaux Decl. ¶12; Ross Decl. ¶12. They do not in their affidavits make comparable assertions concerning the effect of climate change.

summary judgment does not create a genuine dispute concerning the injury in fact element of standing on that claim. At the August 21, 2013 hearing, plaintiffs argued that paragraph 39 of their Statement of Undisputed Facts supports their standing to assert their Climate Change Claim. That paragraph of plaintiffs' Statement of Undisputed Facts references an EPA report entitled: "National Water Program Strategy Response to Climate Change." Pls.' Ex. 50. That report states that increased air temperatures will result in higher water temperatures, which "foster harmful algal blooms and change the toxicity of some pollutants." Id. at ii. Molyneaux and Ross's affidavits state that their interests in the embayments are harmed by excessive algae growth. See Molyneaux Decl. ¶4; Ross Decl. ¶6. However, neither of the affidavits, nor the EPA's publication concerning climate change, provide evidence of any link between the algae growth that contributes to Molyneaux and Ross's alleged injury and the EPA's actions or omissions with respect to climate change.[6]

B. Causation

The causation element of standing requires that "the injury has to be fairly . . . trace[able] to the challenged action of the

---

[6] Even if the statement in the EPA report that climate change "foster[s] harmful algal blooms" were deemed sufficient evidence of the required linkage, defendants' motion for summary judgment on the Climate Change Claim would be meritorious because, as explained below, plaintiffs have not provided sufficient evidence to prove redressibility.

defendant, and not . . . th[e] result [of] the independent action
of some third party not before the court." Lujan, 504 U.S. at 560
(internal quotation marks omitted); see also Katz, 672 F.3d at 71-
72. With respect to the Misclassification Claim, the court assumes,
without finding, that the Molyneaux and Ross affidavits are
adequate to establish a genuine dispute of fact concerning the
causation element of standing.

    C. <u>Redressibility</u>

    To satisfy the redressibility element of standing, "it must be
likely, as opposed to merely speculative, that the injury will be
redressed by a favorable decision." Lujan, 504 U.S. at 561
(internal quotation marks omitted); see also Katz, 672 F.3d at 72.
The admissible evidence in this case would not permit a reasonable
factfinder to conclude that the relief that plaintiffs seek with
respect to each of their claims would likely remedy any injury that
they have suffered.

    With regard to the Misclassification Claim, plaintiffs seek
declaratory and injunctive relief that would vacate the EPA's
approval of the TMDLs and order the EPA to allocate the Sources to
the WLA. See Compl. at 22-23. Reassigning the Sources to the WLA as
point sources would subject them to the federal NPDES permitting
system as opposed to the discretionary state regulatory regime that
governs non-point sources. See Upper Blackstone, 690 F.3d at 14;
Defenders of Wildlife, 415 F.3d at 1124. The primary proffered

evidence that federal regulation of the Sources would redress the alleged injury to plaintiffs' members is the opinions of lay witnesses Molyneaux and Ross. Molyneaux states that she "believe[s] that if EPA and the Cape Cod Commission were taking a more active role in regulating the nitrogen pollution from these sources, the waterways would not be in their current degraded condition." Molyneaux Decl. ¶12. Similarly, Ross states that, "I believe that the EPA regulation of point sources on Cape Cod, such as septic systems, wastewater treatment facilities, and stormwater, will assure that effective measures will be taken to reduce nitrogen pollution." Ross Decl. ¶13. Ross further asserts that he is "harmed by EPA's failure to permit these sources." Id.

Molyneaux and Ross's opinions about the effects of the EPA's regulation of the Sources do not constitute admissible evidence. Molyneaux and Ross's opinions as lay persons are only admissible if they are "rationally based on the witness's perception," helpful to the factfinder, and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702," which governs testimony by expert witnesses. Fed. R. Evid. 701. In this case, the declarants' beliefs about the effects of the EPA's regulation of the Sources are not based on their personal perception. Compare United States v. Valdivia, 680 F.3d 33, 50 (1st Cir. 2012) (holding that a law enforcement officer's conclusion that drug "traffickers often list unrelated third parties as their telephones'

subscribers" was properly admitted as lay testimony because it was derived from personal knowledge the officer had obtained as a law enforcement official). More specifically, neither Molyneaux nor Ross provides an explanation for her or his view that federal regulation of nitrogen emissions would be more effective than state regulation, or describes any personal experience that would justify that view. See Lynch v. City of Boston, 180 F.3d 1, 16 (1st Cir. 1999).[7] Rather, the opinions of Molyneaux and Ross are speculative and inadmissible. See Alexis v. McDonalds Restaurants of Mass., Inc., 67 F.3d 341, 347 (1st Cir. 1995).[8] Only an expert with specialized knowledge could possibly provide admissible opinion

---

[7] In Lynch, the First Circuit found that a lay person's opinion concerning his co-worker's performance on the job was sufficiently based on his perception to be admissible, even though the court upheld the district court's exclusion of the lay opinion on other grounds. See 180 F.3d at 16-17. The court stated that, "that no irrational leaps of logic would have been required in order for [the lay witness] to render the rather straightforward opinion" concerning his co-worker's job performance. Id. In contrast, Molyneaux and Ross's opinions about the effects of federal regulation on nitrogen pollution are not straightforward or based on their personal perception.

[8] In Alexis, an African-American woman and her family filed a suit against McDonalds and one of its employees, among others, for alleged racial discrimination. See 67 F.3d at 346. The First Circuit upheld the district court's exclusion of certain lay opinion testimony about the racial motivation of the defendants because "the proffered testimony was not supported by sufficient factual undergirding to permit a reasonable inference that either [the McDonalds employee] or McDonald's discriminated against [the plaintiff] on the basis of her race." Id. at 347 (internal quotation marks omitted). In the instant case, the admissible evidence does not support Molyneaux and Ross's opinions that federal regulation would be more effective than state regulation in limiting the nitrogen pollution in the embayments.

testimony on whether federal regulation would impact nitrogen discharges differently, and more effectively, than state regulation. See, e.g., Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp., 207 F.3d 789, 793-94 (5th Cir. 2000). Accordingly, the opinions of Molyneaux and Ross are insufficient to create a genuine dispute because "[a] genuine issue of material fact can be created only by materials of evidentiary quality." Hannon, 645 F.3d at 49; see also Vazquez, 134 F.3d at 36.

Moreover, plaintiffs conceded at the hearings on the cross-motions for summary judgment that the reclassification of the Sources from the LA to the WLA would not immediately change the amount of nitrogen authorized to be emitted into the embayments. At the hearings, plaintiffs pointed to no evidence indicating that the EPA would not permit the same levels of nitrogen to be emitted into the waters if the federal agency, rather than the state, regulated the Sources.

Although not mentioned by plaintiffs at the hearings, the court has considered the reference in their memorandum in opposition to defendants' motion for summary judgment, that the "EPA has acknowledged 'it is difficult to ensure, a priori[,] that implementing nonpoint source controls will achieve expected load reductions.'" (Docket No. 56) at 3 (quoting Pls.' Ex. 67, EPA_02160). This statement by the EPA is evidence that state regulation generally may in some cases be inadequate. It is not

evidence that Massachusetts' regulation of non-point sources has been inadequate with regard to the emission of nitrogen into the Cape Cod embayments.

More significantly, for the issue of redressibility, the cited statement of the EPA is not evidence that designating the Sources as point sources, and subjecting them to federal regulation through the permitting process, would eventually result in a material reduction of nitrogen emissions. Where, as here, non-toxic pollutants are at issue, the EPA has the discretion to issue permits that authorize the emission of a greater amount of an effluent than is consistent with the water quality standard if "there is no reasonable relationship between the economic and social costs and the benefits to be obtained." 33 U.S.C. §1312(b)(2)(A). There is no evidence that in the exercise of this discretion, the EPA would, for example, impose significant restrictions on septic systems, and therefore property owners throughout Cape Cod, in order to materially reduce nitrogen emissions. Rather, on the present evidentiary record it would require speculation to find that a reasonable factfinder could conclude that reclassifying the Sources would redress plaintiffs' injury. Again, such speculation is not sufficient to establish a required element of standing. See Lujan, 504 U.S. at 561.[9]

---

[9] Mr. Kilian's public comment that the EPA has erroneously classified the Sources as non-point sources and, therefore, allocated them to the LA as opposed to the WLA also does not

In view of the foregoing, plaintiffs have not provided admissible evidence sufficient to establish a genuine dispute concerning the redressibility of their Misclassification Claim.

Even if, contrary to the court's conclusion, plaintiffs were found to have established a genuine dispute concerning their injury with respect to the Climate Change Claim, and to have provided adequate evidence of causation, they have failed to submit sufficient evidence of redressibilty with respect to that claim. The relief that plaintiffs seek in connection with the Climate Change Claim is an injunction that would: (1) bar the EPA from approving any TMDL for the embayments that fails to analyze how climate change will affect those waters; and (2) require the EPA to include in the TMDLs an adequate margin of safety. See Compl. at 22-23. Plaintiffs also seek a declaration that the EPA's approvals of the TMDLs was arbitrary, capricious, an abuse of discretion, and contrary to law because the agency failed to analyze climate change in connection with the TMDLs and include an adequate margin of safety in them. See id. at 22.

As discussed earlier, at the hearings on the cross-motions for summary judgment, the only evidence in the record to which

---

address whether federal regulation of the Sources, as opposed to state regulation, would reduce the amount of nitrogen in the embayments. See Pls.' Ex. 51, EPA_12290-91. Nor have plaintiffs argued that the MEP reports, which specifically mention the water quality work of BBC, contain any evidence about the effect of federal regulation of the Sources.

plaintiffs pointed with respect to their Climate Change Claim was paragraph 39 of their Statement of Undisputed Facts. That paragraph cites an EPA report for the proposition that the TMDL program is one of numerous water quality programs that will be affected by climate change, in part because as water temperatures rise more bodies of water will not meet water quality standards and will, therefore, require the development of a TMDL. See Pls.' Ex. 50 at 9. The EPA's report further states that, "discharge permits and nonpoint pollution control programs may need to be adjusted to reflect changing conditions." Id. (emphasis added). The fact that, in general, more TMDLs may be required and adjustments to pollution controls may need to be made in some areas as a result of climate change does not constitute evidence that the EPA's inclusion of the effects of climate change in the TMDLs at issue in this case would likely alter the pollution levels that are affecting plaintiffs' interests in the particular embayments on Cape Cod involved in the instant case.

In view of the foregoing, defendants' motion for summary judgment is meritorious because plaintiffs have provided insufficient evidence that they have standing to litigate their claims. Therefore, judgment will enter for defendants.

VI. THE MOTIONS TO INTERVENE

The Sandwich Water District, the Bourne Water District, and the Town of Falmouth have moved to intervene in this case. The

Sandwich Water District and Bourne Water District seek to intervene "for the limited purposes of reserving their right to participate in any future settlement negotiations, to stay abreast of the proceedings in a meaningful way by receiving copies of the administrative record, discovery requests, and documents produced, to be represented at selected hearings, and to provide briefs and other statements on selected issues and matters." Mot. of Sandwich Water Dist. and Bourne Water Dist. to Intervene ¶1. The Town of Falmouth seeks to intervene in this case for the same reasons, and also "to participate in the relief or remedy stage of this litigation." Mot. of the Town of Falmouth to Intervene ¶1.

Because defendants' Motion for Summary Judgment is being allowed and this case is being dismissed, the issues of concern to the purported interveners are no longer before the court. As there is no case in which to intervene, the motions to do so are moot.

VII. ORDER

In view of the foregoing, it is hereby ORDERED that:

1. Defendants' Motion for Summary Judgment (Docket No. 35) is ALLOWED. Judgment shall, therefore, enter for defendants.

2. Plaintiffs' Motion for Summary Judgment (Docket No. 39) is DENIED.

3. Motion of Sandwich Water District and Bourne Water District to Intervene as Non-Aligned Parties (Docket No. 31) is MOOT.

4. Motion of the Town of Falmouth to Intervene as a Non-

Aligned Party (Docket No. 50) is MOOT.

     5. Motion of Town of Falmouth for Leave to File Affidavit of Eric T. Turkington in Support of Its Motion to Intervene as a Non-Aligned Party (Docket No. 67) is MOOT.

       /s/ Mark L. Wolf    
UNITED STATES DISTRICT COURT
